FILED
2019 Jun-24  PM 03:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
BIRMINGHAM DIVISION**

| | |
|---|---|
| **VALLEY CREEK LAND & TIMBER, LLC,** | |
| *Plaintiff,* | **CIVIL ACTION NO.: _____** |
| **v.** | |
| **COLONIAL PIPELINE COMPANY,** | **JURY TRIAL DEMANDED** |
| *Defendant.* | |

## COMPLAINT

COMES NOW Plaintiff, Valley Creek Land & Timber, LLC (hereinafter "Valley Creek"), and files this complaint against Defendant, Colonial Pipeline Company (hereinafter "Colonial"), and states as follows:

## INTRODUCTION

1.      Shelby County, Alabama is one of the fastest-growing counties in Alabama and is highly regarded as a place to live and raise children.[1]  Since the early 2000s, Shelby County has continued to experience rapid population growth as a result of its central and convenient location, quality of life, and infrastructure.  It has strategically positioned itself to continue attracting high-paying jobs and fast-growing industries, and at its current population growth rate will soon have as many residents as the city of Birmingham.[2]

---

[1]  In 2017, Shelby County was ranked 35th out of 2,770 counties for "Best Counties for Families in America" by a national ranking and review service based on quality and cost of living, public schools, diversity, and crime rates.

[2]  *See* Erin Edgemon, *Census: Shelby County Drives Growth in Metro, Jefferson County Stagnant*, AL.com, Mar. 22, 2018, https://www.al.com/news/birmingham/2018/03/census_shelby_county_drives_gr.html; Erin Edgemon, *Shelby County Still Fuels Growth in Birmingham Metro, JeffCo Sees Small Drop*, AL.com, Mar. 30, 2017, https://www.al.com/news/birmingham/2017/03/shelby_st_clair_counties_see_g.html.

2.      In August of 2014, Valley Creek, a family-owned and operated land and timber investment company, purchased 5,759 contiguous acres of real property located in Shelby County, Alabama (hereinafter "the Property").

3.      Relying on decades of experience and knowledge regarding successful real property investments, Valley Creek purchased the Property understanding that its highest and best use was for residential and commercial development to support and complement the continuing growth Shelby County is experiencing.

4.      The Property is located near the newly constructed Helena High School and extends to and abuts the Cahaba River, the longest free-flowing river in Alabama.  The Cahaba River is among the most scenic and biologically diverse rivers in the United States and is used by Alabamians for recreational activities, including fishing, boating, and for residential living.

5.      However, on September 9, 2016, one of the worst gasoline spills in Alabama's history was discovered on the Property.  A defective and faulty petroleum pipeline system (hereinafter "the Pipeline"), owned and operated by Colonial had ruptured, unlawfully releasing approximately 300,000 gallons of toxic and dangerous gasoline and other harmful petroleum contaminants into the heart of the Property (hereinafter "the Spill").

6.      The Spill physically contaminated and polluted the Property with numerous toxic and carcinogenic chemicals.  Many of these chemicals are designated as hazardous pollutants that are destructive to human health and the environment, including benzene (a known carcinogen and reproductive system toxin), toluene (a reproductive system toxin), ethylbenzene (a known carcinogen), naphthalene (a possible human carcinogen), xylenes, and methyl tert-butyl ether ("MTBE").

7.      Not surprisingly, the Spill received extensive statewide and national television and

media coverage.[3]

8.      Shockingly, this was only one of five separate spills that occurred in Alabama alone in 2016 and 2017 because of Colonial's failure to properly and safely operate, maintain, and repair the Pipeline.  These five spills released a combined 500,000 gallons of toxic and dangerous gasoline and other harmful petroleum contaminants throughout the state of Alabama.

9.      On October 31, 2016, less than two months later, and only five miles from the Spill, a second massive spill occurred when Colonial's subcontractor struck the Pipeline with a large "track hoe" excavator while attempting to make repairs related to the Spill.  This caused the Pipeline to again rupture, igniting the gasoline and causing an enormous explosion.  The deadly explosion and subsequent gasoline-fueled fire burned for several days and released 170,000 additional gallons of toxic and dangerous gasoline into the environment.  It killed two individuals, severely burned several others, and caused Alabama's governor to declare a state of emergency and order an evacuation for several miles surrounding the explosion.  This event also received extensive statewide and national television and media coverage.[4]

10.     Because of Colonial's egregious failure to properly and safely operate, maintain, and repair the Pipeline, Valley Creek has suffered catastrophic damages and the Property's value has been devastated.   Valley Creek now seeks judgment against Colonial for compensatory

---

[3]   *See* Connor Sheets, *Alabama Gasoline Spill: Nearby Residents Worry About Impacts on Health, Environment*, AL.com, Sept. 16, 2016, https://www.al.com/news/2016/09/alabama_gasoline_spill_nearby.html; Connor Sheets, *Latest Alabama Pipeline Leak Marks Colonial's Fifth in the State this Year*, AL.com, Sept. 27, 2016, https://www.al.com/news/birmingham/2016/09/latest_alabama_pipeline_leak_m.html; Alan Blinder, *Gas Prices Surge in South After Pipeline Leak*, NYTimes.com, Sept. 19, 2016, https://www.nytimes.com/2016/09/20/us/gas-prices-surge-in-south-after-pipeline-leak-drains-fuel-supplies.html.
[4]   *See* Phil Helsel, *1 Dead in Colonial Gasoline Pipeline Explosion in Alabama*, NBC News, Nov. 1, 2016, https://www.nbcnews.com/news/us-news/1-dead-colonial-gas-pipeline-explosion-alabama-n676046; Connor Sheets, *Colonial says Alabama Pipeline Explosion 'Related' to September Gas Leak*, Nov. 1, 2016, https://www.al.com/news/birmingham/2016/11/colonial_says_alabama_pipeline.html; Jay Reeves and Jeff Martin, *Explosion in Alabama Shuts Gas Pipeline; Shortages Possible*, The Washington Times, Nov. 1, 2016, https://www.washingtontimes.com/news/2016/nov/1/explosion-in-alabama-shuts-gas-pipeline-shortages.

damages, punitive damages, and such other relief as this Court deems just and proper.

## STATEMENT OF PARTIES, JURISDICTION, AND VENUE

11.     The foregoing paragraphs are incorporated here by reference, as if set forth in full.

12.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332.  The amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.

13.     Plaintiff Valley Creek is a limited liability company organized under the laws of Mississippi, and its principal place of business is in Mississippi.  The members of Valley Creek are all citizens of Mississippi.

14.     Defendant Colonial is incorporated under the laws of Delaware and Virginia, and its principal place of business is in Georgia.  No member of Valley Creek is a citizen of Delaware, Virginia, or Georgia.  Therefore, complete diversity of citizenship exists.

15.     Venue in this Court is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District and the Property that is the subject of this action is situated in this District.

## FACTUAL ALLEGATIONS

16.     The foregoing paragraphs are incorporated here by reference, as if set forth in full.

17.     Colonial owns and operates the Pipeline which runs from Texas to New Jersey and transports refined petroleum products, including gasoline, jet fuel, high and low sulfur diesel fuel, and home heating oil.

18.     The Pipeline was constructed 56 years ago and became fully operational in 1964. Two 36-inch below-ground portions of the Pipeline run under the surface of real property throughout the state of Alabama, including directly through the Property.

19.     Colonial, as the owner and operator of the Pipeline, has ultimate responsibility for its safe operation, maintenance, and state of repair, as well as knowing the Pipeline's condition at all times.   These duties, with respect to the safe operation, maintenance, state of repair, and condition of the Pipeline are non-delegable.

20.     The Pipeline presents serious safety risks to people, property, and the environment. Colonial has a history of repeated failures and problems with the Pipeline, including over 200 "incidents" between 2006 and 2017 that have resulted in at least $139 million in property damage and spills of approximately 798,000 gallons of hazardous chemicals.   Colonial's disregard for human health, safety, and the environment is part of a pattern and practice that it has demonstrated across the country.   The number, frequency, and severity of the incidents demonstrate systemic failures in Colonial's operation, monitoring, and maintenance of the Pipeline.

21.     Valley Creek is a land and timber investment company with real property investments in the state of Alabama.

22.     In August of 2014 Valley Creek made a substantial investment in Shelby County, Alabama when it purchased 5,759 contiguous acres of real property therein.   At that time, Valley Creek was aware of Shelby County's growing population and understood that the Property's highest and best use was for developmental purposes.

*September Gasoline Spill*

23.     On September 9, 2016, an Alabama mining inspector detected a strong odor of gasoline coming from Valley Creek's property near the Pipeline.   Unbeknownst to the inspector, he had just discovered one of the largest gasoline spills in Alabama's history.

24.     Shortly after the Alabama Surface Mining Commission reported the Spill the Pipeline and Hazardous Materials Safety Administration ("PHMSA"), the federal agency

responsible for developing, overseeing, and enforcing rules and regulations for operating safe, reliable, and environmentally sound petroleum transmission pipelines, issued a "Corrective Action Order" requiring Colonial to shut down a portion of the Pipeline and take necessary corrective actions to protect the public, property, and environment from the serious hazards associated with the Spill.  A copy of this Order is attached hereto as Exhibit A.

25.     PHMSA issued the Order without prior notice to Colonial or an opportunity for a hearing, in part because of Colonial's history of problems and failures with the Pipeline.  PHMSA found that "the history of known problems or failures on the pipelines being owned and operated" by Colonial "provide for the issuance of a Corrective Action Order, without prior notice and opportunity for hearing." *See* Exhibit A at 5.

26.     After shutting down Lines 1 and Line 2 of the Pipeline, it was determined that Line 1, located in the heart of the Property, had ruptured, causing the catastrophic release of approximately 300,000 gallons of gasoline and other harmful petroleum contaminants into the Property.

27.     Because Colonial did not detect the rupture and subsequent leak, the Spill took place over an extended period of time, becoming massive in size and volume, and allowing the toxic and dangerous gasoline and other harmful petroleum contaminants to permeate deep into the Property.

28.     Colonial's deficient leak-detection system, which includes the use of computers to monitor flow rates, pressures, pump operation status, and valve positions, inexplicably failed to detect the Spill, allowing the continued release of toxic and dangerous gasoline into the Property for an undetermined period of time prior to its inadvertent discovery by the Alabama inspector.

29.     Colonial's leak-detection system also involved the use of airplanes to fly over the Pipeline and perform visual inspections on a weekly basis, weather permitting.  During these flights, any sighting of dead vegetation and/or a gasoline sheen on a surface of water adjacent to the Pipeline would indicate a high likelihood of a leak.  Yet, while federal, state, and local officials all clearly observed a film, sheen, and/or discoloration on Pond # 1 located on the Property, along with dead vegetation surrounding the Spill, Colonial inexplicably failed to detect the massive Spill, allowing for the continued release of gasoline into the Property.

30.      Colonial also claims to use sophisticated electronic equipment called "smart pigs" that travel inside the Pipeline looking for anomalies or signs of the pipe wall weakening, including the detection of cracks, thinning of the wall, or other issues that would require the Pipeline to be excavated for closer inspection and, if necessary, repair or replacement.  However, these "smart pigs" allegedly did not detect any anomalies, signs or indications of the Pipeline's weakness prior to, or during, the Spill.

31.     The segment of the Pipeline that failed was constructed in 1963 and was 36-inches in diameter and had a 0.281-inch wall thickness.  Colonial's own report later concluded that the Spill was caused by "pipe failure that resulted from inadequate soil consolidation under Line 1 following maintenance/recoating activates" conducted the previous year by Colonial.

32.     The Pipeline's failure from allegedly "inadequate soil consolidation" should not have occurred and further demonstrates Colonial's pattern and practice of reckless and faulty workmanship and gross negligence when operating, maintaining, and repairing the Pipeline.

33.     Colonial initially reported that between 1,000 and 2,000 gallons of gasoline were spilled from the ruptured Pipeline.  However, it was later determined that the Pipeline had spilled approximately 300,000 gallons of toxic and dangerous gasoline into the Property.[5]

34.     After discovery of the Spill, federal, state, and local emergency and environmental protection agencies mobilized to conduct the emergency response effort.[6]  These agencies included the U.S. Environmental Protection Agency ("EPA"), the U.S. Coast Guard Gulf Strike Team, the Superfund Technical Assessment and Response Team, PHMSA, the Alabama Department of Environmental Management ("ADEM"), Shelby County Emergency Management, and the Helena Fire Department.

35.     The emergency response effort focused on containing the Spill and its immediate threat to human life and health, wildlife, and the environment.  At the height of the emergency, approximately 800 individuals were called upon to assist in the response effort.  A large area around the Spill was cordoned off for public safety due to hazardous and explosive gasoline fumes.  Federal officials implemented a "no-fly" zone around the site of the Spill.  The Cahaba River Wildlife Management Area was closed to all recreational use and an Incident Command Post was established in Hoover, Alabama.

36.     Environmental contractors arrived to begin assessing the impact to air, surface water, soil, and wildlife and to begin mitigation efforts.  However, work to mitigate the Spill was almost immediately suspended and all personnel were evacuated due to dangerously high concentration levels of benzene and explosive gasoline vapors around the Spill.[7]

---

[5]  The EPA estimated the gasoline spill volume to be between 252,000 gallons and 336,000 gallons.

[6]  The National Response Center assigned the Spill release number "NRC No. 1158584."  ADEM assigned the Spill "Groundwater Incident No. GW16-09-01" and/or "Off County Road 91."

[7]  Pursuant to the Centers for Disease Control, inhalation of high concentrations of benzene can result in death.

37.     Several days later, when it was determined that governmental agencies and environmental contractors could safely access the Property, mitigation efforts commenced.  These efforts included construction of an underflow dam to push the hazardous and toxic gasoline towards a pond located on the Property for recovery, plugging a culvert that connected two of the existing ponds, flushing a ravine, and using absorbents to remove some of the gasoline.

38.     Because the Pipeline was shut down for 12 days after the Spill was discovered, Colonial was anxious to repair the Pipeline so it could once again start delivering various petroleum products.  However, prior to restarting the Pipeline, Colonial had to build a 500-foot bypass on the Property and around the damaged portion of the Pipeline.

39.     Federal and state environmental agencies also began testing the groundwater, surface water, and soil on the Property, including the use of approximately 12 "Type II" groundwater monitoring wells and one "Type III" groundwater monitoring well.

40.     The Property was also inundated by hundreds of employees of Colonial and its subcontractors.  These contractors were engaged by Colonial to repair the Pipeline and follow the Corrective Action Order issued by PHMSA.

41.     However, these efforts were unable to remove the long-term contamination, pollution, and damage that remains on the Property.   While the response effort recovered approximately 66,000 gallons of gasoline, approximately 234,000 gallons were never recovered. The toxic and dangerous gasoline and petroleum constituents that remain have broken down into hazardous carcinogens, including benzene, toluene, ethylbenzene, xylenes, naphthalene, and MTBE.

42.     Benzene is categorized by the EPA as a carcinogen.  Long-term exposure can cause certain types of blood cancer, including acute myeloid leukemia[8] and myelodysplastic syndromes.[9] Exposure to elevated levels of toluene can cause acute and chronic damage to the brain, central nervous system, and reproductive system.

43.     Moreover, these mitigation efforts seriously damaged the Property's surface through the drilling of multiple monitoring and recovery wells, building of dams, spreading tons of gravel and other materials, and operating of heavy equipment and machinery.  This included the excavation of more than 15,600 tons (31.2 million pounds) of contaminated soil, which has destroyed the Property's natural forest, timber, and topography.

### October Explosion and Gasoline Spill

44.     Following the Spill, Colonial's effort to repair the Pipeline necessitated accessing and excavating a section of the Pipeline that was within five miles of the Property.  As part of these efforts, Colonial engaged a subcontractor to perform the necessary repairs on the Pipeline.  While Colonial routinely engages subcontractors to perform excavation and repair work, Colonial is responsible for all such work and had a duty and responsibility to ensure that its subcontractors work was performed in a safe manner that was compliant with federal rules and regulations, industrial standards, and Colonial's internal standards.

45.     On October 31, 2016, while working on that section of the Pipeline, the subcontractor struck the Pipeline with a large "track hoe" excavator while attempting to make

---

[8]   Acute myeloid leukemia ("AML") is a type of blood cancer.  It usually begins in cells that turn into white blood cells.  Without treatment, AML can quickly be life-threatening.  Because it's "acute," this type of leukemia can spread quickly to the blood and to other parts of the body, such as the lymph nodes, liver, spleen, brain, spinal cord, or testicles.

[9]   Myelodysplastic syndromes ("MDS") are a rare group of disorders in which your body no longer makes enough healthy blood cells.  The syndromes are a type of cancer.  In the early stages of MDS, you may not realize anything is even wrong.  However, eventually you may start to feel very tired and short of breath.

repairs related to the Spill, which caused the Pipeline to again rupture, igniting the gasoline, and causing an enormous explosion.  The explosion and subsequent gasoline-fueled fire burned for several days, released 170,000 additional gallons of gasoline, killed two individuals, and severely burned several others.  Immediately thereafter, Alabama's governor declared a state of emergency and ordered an evacuation for several miles surrounding the explosion.

46.     Following the explosion, the ranking members of the U.S. House of Representatives' Committee on Energy and Commerce and the Committee on Transportation and Infrastructure, as well as the ranking members of three House Subcommittees, urged the Secretary of the U.S. Department of Transportation to investigate Colonial.  These Representatives stated that, "[t]his is an unacceptable situation, and we are concerned that the number, frequency and severity of significant incidents on Colonial's system over the past five years could be symptomatic of severe underlying problems with the system and the company's management of that system."  A copy of this Letter is attached hereto as Exhibit B.

47.     Prior to the fatal explosion, PHMSA had taken the lead on investigating the Spill that occurred on the Property.  However, after the explosion and subsequent spill, the National Transportation and Safety Board ("NTSB") took over the investigation into both spills.

48.     The deadly explosion and subsequent spill also received extensive statewide and national television and media coverage, and has resulted in multiple ongoing lawsuits against Colonial for the wrongful death of two individuals, massive property damage, and environmental contamination.[10]

---

[10]   *See The State of Alabama, ex rel. Steve Marshall, Attorney General, and The Alabama Department of Environmental Management vs. Colonial Pipeline Co.*, (Civil No. 58-cv-2018-900207); *Hugh Gerald DeLaughder, Jr. and Patsy Ann Whatley, Individually and as Administratrix of the Estate of Bill  Monroe Whatley, deceased vs. Colonial Pipeline Co., et al.*, (Civil No. 18EV003227); *Beverly Kay Willingham, Individually and as Administratrix of the Estate of Anthony Lee Willingham, deceased vs. Colonial Pipeline Co., et al.*, (Civil No. 18-C06090-4); and *Timothy Webster; Shelby Investments, LLC; and Cahaba Outfitters, LLC vs. Colonial Pipeline Co., et al.* (Civil No. 58-cv-2017-901175).

*Damages from the Spill*

49.     The Spill has caused extensive and catastrophic damage to the Property's value. The Property cannot be developed or sold at what was its highest and best use prior to the Spill. The discharge of the toxic and hazardous gasoline and its harmful contaminants into uncontained surface or subsurface areas and waters on the Property was widespread and has caused long-term contamination, pollution, and damage.

50.     Test results from the Property have shown hazardous and toxic chemical levels that exceed relevant safety standards.  These relevant safety standards are designed to protect individuals from serious health problems, including an increased risk of cancer, nervous system damage, liver and kidney damage, and anemia.

51.     The Spill and subsequent mitigation efforts have impacted more than just the area of the Property where the plume of toxic and harmful petroleum contaminants were spilled.

52.     As a direct and proximate result of Colonial's acts and omissions, the Property has experienced significant diminution in value due to physical contamination and pollution, environmental stigma from physical contamination and pollution, the creation of harmful conditions to human health and the environment, and a continuous nuisance.

*Colonial's Pattern and Practice of Pipeline Failures and Spills*

53.     Colonial has a vast and disturbing record of serious safety and environmental violations from multiple high-volume spills in connection with its failure to properly operate, maintain, and repair the Pipeline.  Colonial has incurred large fines and has entered into numerous settlements as a result of these violations, yet these spills continue to occur at a substantial cost to human health and safety, the environment, and property rights.

54.     In April of 2003, Colonial paid a record $34 million civil penalty, the largest civil penalty a company had ever paid at that time, to resolve a case brought by the United States regarding Colonial's violations of the Clean Water Act by unlawfully releasing an estimated 1.45 million gallons of petroleum products from its Pipeline in the states of Alabama, South Carolina, North Carolina, Tennessee, Georgia, Maryland, Virginia, New Jersey, and Louisiana.  *See United States v. Colonial Pipeline Co.*, Case No. 1:00-cv-03142-JTC (N.D. Ga.).

55.     Along with these civil penalties, Colonial also entered into a Consent Decree with the United States.  Under the terms of the Consent Decree, Colonial was obligated to inspect its corrosion prevention system along the entire pipeline system every five years, repair problems detected in the corrosion prevention system to meet the standards developed by the National Association of Corrosion Engineers, survey and inspect the Pipeline where it crossed water, address areas of the Pipeline that were exposed or insufficiently buried, and improve its inspections and surveys of pipeline fixtures as reflected by its Maintenance Manual.  A copy of this Consent Decree is attached hereto as Exhibit C.

56.     Unfortunately, the $34 million civil penalty, Consent Decree, and increased obligations have done little to stop these hazardous and damaging petroleum spills from occurring.

57.     On March 8, 2018, the state of Alabama sued Colonial seeking civil penalties for the five separate, unauthorized releases of petroleum products in Alabama in 2016 and 2017 alone, including the Spill complained of herein.  The complaint asserted that Colonial violated the Alabama Water Pollution Control Act, the Alabama Air Pollution Control Act, and the Alabama Environmental Management Act.[11]  A copy of the Complaint is attached hereto as Exhibit D.

---

[11]  The five unauthorized releases of petroleum products into the environment that were the subject of the Alabama Consent Decree are referred to as the Double Oak Incident, the Heflin Incident, the CR-91 Incident, the CR-251 Incident, and the CR-459 Incident.

58.     On March 14, 2018, only six days later, Colonial settled with the state of Alabama, agreeing to pay the State $3.3 million and entering into a Consent Decree for these violations.  A copy of the Alabama Consent Decree is attached hereto as Exhibit E.

59.     Colonial also has a history of violating PHMSA's pipeline rules and regulations. Nationwide, Colonial filed 125 "incident reports" with PHMSA between April 23, 2010 and May 4, 2016.  From 2002 to 2017, 11 enforcement cases were brought against Colonial by PHMSA.

60.     This egregious pattern and practice of long-term contamination, pollution, and statutory violations establish Colonial's ongoing reckless and negligent conduct.

## STATUTE OF LIMITATIONS

61.     On or about October 25, 2017, Colonial and Valley Creek executed a Tolling Agreement, a copy of which is attached hereto as Exhibit F.  At the time the Tolling Agreement was executed, no claim asserted herein was time-barred by any applicable statute of limitations. Pursuant to the Tolling Agreement, the parties thereto agreed that the statute of limitations applicable to any claim arising out of the Spill would not run while the Tolling Agreement was in effect.  The Tolling Agreement was in full force and effect as of the date this complaint was filed.

62.     The Tolling Agreement specifically provides as follows:

> No Limitation of Rights.  By entering into this Tolling Agreement the Owners do not intend to waive or in any way limit any rights they have now or may have at any time in the future to file suit or make claims against Colonial, and Colonial acknowledges that this Tolling Agreement does not waive or limit any rights of Owners to institute legal proceedings if any such claims are not settled. Notwithstanding the foregoing, in the event Owners elect to file suit during the Tolling Period, Owners shall provide Colonial thirty (30) days' written notice prior to instituting legal proceedings against Colonial and this Tolling Agreement shall terminate upon the filing of the suit noticed.

*See* Exhibit F at ¶ 3.

14

63.     Pursuant to the Tolling Agreement's requirement, Valley Creek has provided Colonial with thirty (30) days written notice prior to filing this complaint.

## CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE

64.     The foregoing paragraphs are incorporated here by reference, as if set forth in full.

65.      At all times relevant hereto, Colonial owed Valley Creek a duty to exercise reasonable and ordinary care in operating, maintaining, and/or repairing the Pipeline in a manner that would prevent the massive release of toxic and dangerous gasoline and other harmful petroleum contaminants into the Property.

66.     Colonial breached its duty of care by:

a.      failing to operate, maintain, and/or repair the Pipeline in such a manner as to prevent the release of toxic and dangerous gasoline and other harmful petroleum contaminants into the Property;

b.      failing to properly design, construct, and/or install the Pipeline in such a manner as to prevent the release of toxic and dangerous gasoline and other harmful petroleum contaminants into the Property;

c.      failing to properly inspect and/or monitor the Pipeline in such a manner as to prevent the release of toxic and dangerous gasoline and other harmful petroleum contaminants into the Property;

d.      failing to provide adequately trained personnel, supervision, and/or oversight to entities utilized to repair, install, and/or maintain the Pipeline to prevent the release of toxic and dangerous gasoline and other harmful petroleum contaminants into the Property;

e.      failing to prevent and/or detect the continued release of toxic and dangerous gasoline and other harmful petroleum contaminants into the Property.

67.    As a proximate result of Colonial's actions and omissions, Valley Creek has suffered substantial damages.  But for Colonial's acts and omissions, Valley Creek would not have suffered these damages.

68.    Colonial's negligent acts and omissions, as set forth herein, proximately caused significant diminution in value of the Property due to physical contamination and pollution, environmental stigma from physical contamination and pollution, loss of use of the Property, and the creation of harmful conditions to human health and the environment on the Property.

## COUNT II
## WANTONNESS

69.    The foregoing paragraphs are incorporated here by reference, as if set forth in full.

70.    Colonial's egregious pattern and practice of recurring hazardous and toxic spills, in combination with its failure to properly operate, maintain, and/or repair the Pipeline on the Property, were done with a reckless and conscious disregard for the rights of Valley Creek.  These reckless and conscious acts and omissions proximately caused the catastrophic release of approximately 300,000 gallons of toxic and dangerous gasoline into the Property.

71.    Colonial's reckless and conscious conduct is also evidenced by its failure to have taken appropriate steps to prevent, monitor, and/or detect the Spill despite numerous spills, including the five spills that occurred in Alabama in 2016 and 2017.  These five spills alone released a combined 500,000 gallons of toxic and dangerous gasoline and other harmful petroleum contaminants into Alabama's environment.

72.     Colonial's reckless and conscious conduct, as specified herein, constitutes wantonness and a conscious indifference to the health, safety, and property rights of Valley Creek and others, and gives rise to a claim for punitive damages.

**COUNT III**
**INVERSE CONDEMNATION**

73.     The foregoing paragraphs are incorporated here by reference, as if set forth in full.

74.     Colonial has the right and is expressly authorized to exercise the power of eminent domain pursuant to Sections 10A-21-2.01, 2.05 and/or 2.09 of the Code of Alabama.

75.     Valley Creek's ownership of the Property confers the right to lawful use and enjoyment of the Property without such use and enjoyment being prevented or impaired.  The release of gasoline into the Property constitutes an actual physical invasion and occupancy of the Property, which prevents and impairs Valley Creek's lawful use and enjoyment of the Property and has caused damage to the Property as stated herein.

76.     Thus, there has been a physical taking of the Property for public use without formal condemnation proceedings and without just compensation being paid to Valley Creek by Colonial, for which demand is made.

**COUNT IV**
**NUISANCE**

77.     The foregoing paragraphs are incorporated here by reference, as if set forth in full.

78.     At all times relevant hereto, Colonial owed Valley Creek a legal duty and breached that duty by its acts and omissions as stated herein.

79.     Colonial's acts and omissions in operating, maintaining, and repairing the Pipeline have created a private nuisance which interferes, hurts, and damages Valley Creek's right to use and enjoy the Property since the Spill occurred.

80.     Colonial's act of releasing approximately 300,000 gallons of toxic and dangerous gasoline into the Property has created a private nuisance which interferes, hurts, and damages Valley Creek's right to use and enjoy the Property since the Spill occurred.

81.     Colonial's acts and omissions as stated herein have given rise to a private nuisance, having caused and continuing to cause substantial and unreasonable interference, discomfort, annoyance, inconvenience, and damage to Valley Creek's use and enjoyment of the Property.

82.     This private nuisance has interfered and prevented Valley Creek from utilizing the Property for its highest and best use.

83.     Colonial's substantial and unreasonable interference with Valley Creek's use and enjoyment of its Property and utilization of the Property for its highest and best use has proximately caused significant diminution in value of the Property due to physical contamination and pollution, environmental stigma from physical contamination and pollution, loss of use of the Property, and the creation of harmful conditions to human health and the environment on the Property.

## COUNT V
## INJUNCTIVE RELIEF
## REMAINING LIFE STUDY

84.     There is statewide concern regarding the continued operation of the Pipeline based on its substantial age and pattern of reoccurring hazardous and toxic spills, including the five spills that occurred in Alabama in 2016 and 2017 alone.  These spills cause and continue to cause enormous economic and environmental damage to Valley Creek as well as Alabama and its citizens.

85.     The Pipeline's age—it has been continuously operated since 1964—along with its numerous and continuing unlawful releases of gasoline and other harmful petroleum contaminants

merits requiring a Remaining Life Study ("RLS") be performed on the Pipeline to determine its forecasted retirement age, and should include the following:

        a.      The retention of a qualified, independent expert that has conducted independent studies for governmental entities, such as PHMSA, the Pipeline Research Counsel International, or the American Petroleum Institute, to conduct a RLS that is forward-looking in manner and intended to assess the longevity of the Pipeline;

        b.      The expert shall complete the RLS within six (6) months from being retained and a summary of the expert's findings shall be made public (excluding information deemed proprietary or confidential by the Court);

        c.      The RLS will include: (1) the forecasted retirement age of the Pipeline, considering its age, coating type, and leak history, (2) retirement thickness calculations that consider pressure design thickness and minimum structural thickness, (3) remaining life calculations by segment, age, coating type, and soil conditions, (4) a summary of the sections of the Pipeline that were previously repaired or retired with an explanation of the characteristics of the sections that led to the repairs or retirement, (5) a ten year summary of the Pipeline's leak history, including a description of the size of each leak, (6) an explanation of how anomalies and/or dents are formed on the Pipeline and how they are addressed by mitigative measures, (7) an explanation of the evaluation, retention, training, and oversight processes that occur when subcontractors are used to make repairs or mitigative measures on the Pipeline, (8) a schedule identifying portions of the Pipeline to be replaced or remediated over the next five years, and (9) a list and description of the top five highest risks identified on the Pipeline with an explanation as to how those risks are mitigated.

      d.       Colonial will provide an updated report on an annual basis that summarizes its continual process of maintaining the Pipeline's integrity.  This update will include a list of the next year's planned preventative and mitigative actions and a list of integrity enhancements that were performed on the Pipeline the prior year.

## JURY DEMAND

86.    Valley Creek respectfully requests a trial by jury on all issues so triable.

## REQUEST FOR RELIEF

WHEREFORE, Valley Creek respectfully requests the following:

      a.       Entry of judgment against Colonial and in favor of Valley Creek;

      b.       An award of compensatory damages to fairly and fully compensate Valley Creek for all such damages;

      c.       Punitive damages in an amount sufficient to punish Colonial and to deter others similarly situated from such conduct;

      d.       Injunctive relief requiring a RLS be conducted and annually updated on the Pipeline;

      e.       Pre-judgment and post-judgment interest as provided by law and costs and expenses, including reasonable attorneys' fees; and

      f.       Such further and additional equitable relief as the Court may deem just and proper under the circumstances.

Respectfully submitted, this the 24th day of June, 2019.

**VALLEY CREEK LAND & TIMBER, LLC**

By: */s/ Steven A. Martino*
Steven A. Martino (ASB-7433-T69S)
**TAYLOR MARTINO, P.C.**
P.O. Box 894
Mobile, Alabama  36601
Tel: (251) 433-3131
Fax: (251) 433-4207
stevemartino@taylormartino.com

**OF COUNSEL:**

John W. (Don) Barrett (*pro hac vice* to be submitted)
**DON BARRETT, P.A.**
P.O. Box 927
404 Court Square North
Lexington, Mississippi 39095
Tel: (662) 834-2488
Fax: (662) 834-2628
donbarrettpa@gmail.com

Richard R. Barrett (*pro hac vice* to be submitted)
**LAW OFFICES OF RICHARD R. BARRETT, PLLC**
2086 Old Taylor Rd, Suite 1011
Oxford, Mississippi 38655
Tel: (662) 380-5018
Fax: (866) 430-5459
rrb@rrblawfirm.net

Gerald M. Abdalla, Jr. (*pro hac vice* to be submitted)
**ABDALLA LAW, PLLC**
602 Steed Road, Suite 200
Ridgeland, Mississippi 39157
Tel: (601) 487-4590
Fax: (601) 487-4595
jerry@abdalla-law.com

**Defendant to be served as follows:**

Colonial Pipeline                                          *Via Certified Mail*
c/o Corporation Service Company, Inc.
641 South Lawrence Street
Montgomery, AL 36104